IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CRIM. NO. CCB-08-0383 |
| ANTOINE BOYCE, | |
| **Defendant** | |

### RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SENTENCING REDUCTION

The United States of America, by counsel, responds to the motion for reduction of sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A), filed by the defendant Antoine Boyce. For the reasons discussed herein, the Court should deny the motion.

### BACKGROUND

Antoine Boyce, Rahsean Holmes, and their co-defendants were charged by indictment with several crimes, including conspiracy to commit robbery in violation of the Hobbs Act (18 U.S.C. § 1951(a)); conspiracy to distribute narcotics (21 U.S.C. § 846); possession of a firearm by a felon (18 U.S.C. § 922(g)(1)); and possession of a firearm in furtherance of those crimes (18 U.S.C. § 924(c)). Boyce and Holmes went to trial beginning May 5, 2008. On May 19, 2008, a jury convicted the defendants of the conspiracy and firearms counts. The jury did find that the conspiracy to distribute cocaine (Count Six) only involved 500 grams of cocaine, as opposed to the five kilograms charged in the indictment. The jury acquitted Holmes of a single possession with the intent to distribute count.

The evidence presented during the trial demonstrated that Boyce was a drug supplier and criminal accomplice of his co-defendant, Rahsean Holmes. Holmes was a drug-dealer in his own right, and also was interested in planning and committing home invasion robberies of people he

1

suspected of having money. Investigators, working with a cooperating witness, eventually conducted a stash house sting operation in which Holmes, believing he had an opportunity to rob a drug-dealer, began recruiting associates to participate in the crime. One of the persons recruited by Holmes was defendant Boyce.

On August 15, 2007, investigators conducted the undercover sting operation at a Quality Inn in Baltimore City, Maryland. Investigators saw Holmes's vehicle, a Chrysler 300M, arrive near the hotel. Police officers immediately moved in to arrest the group. Before the arrest could be completed, Holmes sped off and led police on a high-speed chase through the streets of south Baltimore. At one point, Holmes smashed his car into a police vehicle that was attempting to stop him. Ultimately, police vehicles successfully brought the Chrysler to a halt by forcing it to crash into a light pole. Officers then placed the occupants under arrest; the driver was identified as Holmes, and one passenger was identified as a co-defendant Terrence Gray. During the search of the car, officers found zip ties and other evidence.

Law enforcement and civilian witness testimony indicated that, at some point during the course of the car chase (prior to the crash), Antoine Boyce bailed out of Holmes's escaping vehicle and fled through a neighborhood. A Drug Enforcement Administration agent observed Boyce running from the scene of the chase area (the circumstances indicating that Boyce had bailed out of Holmes' car). The agent also testified that he searched the area near where co-defendant Antione Boyce had bailed out during the car chase. The agent specifically stated that he saw Boyce hiding near a children's playhouse in the neighborhood.

The agent also testified about the recovery of two loaded firearms from the interior of that same children's playhouse.

Four civilian eyewitnesses from the neighborhood identified Boyce from photo arrays as a man they saw walking and/or running through their neighborhood in the wake of the police activity that day.

Following the August 15 events, DEA obtained a search warrant for a residence of Boyce's family[1] in Baltimore City. At the residence, agents located a conversion van that was believed to be associated with Boyce and Holmes's drug activities. Agents were able to operate the van using a set of keys that had been recovered from the vicinity of the car chase from August 15. Inside the residence, officers recovered a press device designed to compress kilogram quantities.

The Court sentenced Boyce to 210 months' imprisonment, including a 60–month consecutive sentence on the § 924(c) count. The Fourth Circuit affirmed the conviction. *See United States v. Rahsean Holmes and Antione Boyce,* 376 Fed. Appx. 346 (4th Cir. 2010).

The defendant now seeks early release from prison due to the COVID-19 pandemic. The government agrees that the defendant has demonstrated extraordinary and compelling circumstances allowing the Court to consider his request. However, the government believes that the motion should be denied based on the 18 U.S.C. § 3553(a) factors.

**ARGUMENT**

A defendant seeking a reduction of sentence under § 3582(c)(1)(A) first must establish the exhaustion of available administrative remedies through the Federal Bureau of Prisons. In this case, the defendant appears to have satisfied those administrative exhaustion requirements. *See* 18 U.S.C. § 3582(c)(1)(A).

---

[1] It was not definitively established that Boyce lived at that location. Evidence indicated that Boyce sometimes visited the location, and the recovery of the kilogram press and the van from the location linked the location with Boyce, and with the conspiracy in general.

After exhaustion of administrative remedies, relief under § 3582(c)(1)(A) requires that: (1) the inmate establish extraordinary and compelling reasons for release[2]; and (2) the analysis of the 18 U.S.C. § 3553(a) factors warrant release. *See* 18 U.S.C. § 3582(c)(1)(A); *see also Dillon v. United States*, 560 U.S. 817, 826-27 (2010). In this case, that analysis does not support the defendant's request for release.

I. **THE DEFENDANT'S MEDICAL CONDITIONS AS EXTRAORDINARY AND COMPELLING CIRCUMSTANCES.**

As the Court is aware, the government has agreed, per Department of Justice policy, that the Centers for Disease Control's (CDC) published risk factors for incurring a severe, life-threatening case of COVID-19 are relevant in assessing whether an extraordinary or compelling reason exists for a § 3582(c)(1)(A) motion. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed December 31, 2020) [hereinafter "CDC Risk Factors"]. Among other things, the CDC has identified obesity as a condition that exposes a person to an increased risk associated with COVID-19 infection, and

---

[2] As the Court is aware, the government continues to take the position that the scope of extraordinary and compelling circumstances in a § 3582(c)(1)(A) motion is limited to health-based concerns, per the criteria set forth in § 1B1.13 of the United States Sentencing Guidelines. However, the Fourth Circuit recently has recently ruled to the contrary. *See United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020). In that decision, the Court held that § 1B1.13 is not applicable when a defendant files a motion for compassionate release (as opposed to a BOP-filed motion). *Id.* Rather, when a defendant files a motion for relief, the Court held that district courts "are empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise," and need not relegate itself to the reasons outlined in § 1B1.13. *Id.* (citing *United States v. Brooker,* 976 F.3d 228, 230 (2d Cir. 2020)). The government respectfully disagrees with the decision in *McCoy* and is currently evaluating its options for further review. It currently has until January 15, 2021, to seek *en banc* review. In this case, however, the only ground for relief raised by Boyce is his health-based susceptibility to severe illness upon contraction of COVID-19, which falls under § 1B1.13, and the government is not contesting the existence of extraordinary and compelling circumstances in this case. Accordingly, the concerns raised by the government in *McCoy* are not triggered by the claims raised here.

hypertension or high blood pressure as a condition that might expose a person to an increased risk associated with COVID-19 infection. *Id.*

Given the broad definitions established by the CDC for discerning an elevated risk of severe COVID-19 infection, the government does not contest, on the particular facts of this case, that the defendant has established medical conditions constituting extraordinary and compelling circumstances in the context of the COVID-19 pandemic. The government will address the § 3553(a) factors in the next section.

**II.     THE DEFENDANT'S MOTION SHOULD BE DENIED UNDER THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a).**

Even if a defendant has met the threshold requirements for compassionate release, the Court must still consider whether a sentence reduction is warranted according to the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also Dillon*, 560 U.S. at 826-27 (holding that parallel language in Section 3582(c)(2) establishes a similar two-step inquiry); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). Even when a defendant has shown eligibility due to health issues, reduction under § 3582(c) is still a rare and extraordinary remedy. *See Chambliss*, 948 F.3d at 693-94. In this case, the § 3553(a) factors do not support a sentence reduction.

Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes described in § 3553(a)(2):

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D). Those factors do not support release in this case.

A. The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The offense is a serious one. The trial evidence established that the defendant was a member of a robbery and drug distribution scheme. On the day of the stash house sting event, the defendant was a member of his co-defendant's robbery crew who appeared at the Quality Inn for the robbery. During the car chase, the defendant bailed out of Holmes's vehicle and was seen escaping. The recovery of two firearms – from a children's playhouse – indicates that the defendant actually possessed firearms and ditched the firearms at that location during his flight. This was a serious crime, involving deadly weapons, by a group of defendants who were prepared to commit a crime of violence. The crime warranted a significant sentence.

B. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant.

The sentence imposed also must protect the public from the defendant and send an appropriate message of general deterrence.

The defendant's criminal history provides some support for the government's view that the defendant poses a risk to other persons if released. At the same time, the defendant's criminal history is somewhat dated, and predated the crimes in this case by several years. The presentence report (PSR) reflected the following prior convictions:

- In 1997, a CDS possession and resisting arrest conviction. PSR ¶ 45.
- In 1997, a CDS possession conviction. PSR ¶ 47.
- In 1998, an assault second degree conviction. PSR ¶ 48.
- In 1999, CDS possession conviction. PSR ¶ 49.

The government sees this as a relatively modest criminal history.[4] The sequence of drug possession convictions, combined with the narcotics distribution aspect of the instant case, suggests a mild pattern of drug offenses. Likewise, the defendant has two quasi-violent convictions – resisting arrest and assault second degree – that suggest a danger to the community (in combination, again, with the violent aspect of the instant offense). On the other hand, the defendant's convictions are now between 20 and 25 years old, and reflect conduct when the defendant was between 18 and 21 years old. The prior record also predated the instant offense in this case by more than seven years. Overall, the defendant's past record reflects a mild risk of future criminal behavior.

A stronger signal of potential continuing danger to the community (or at least a difficulty on the part of the defendant with compliance with the law) is found in the defendant's BOP disciplinary history. BOP disciplinary records for the defendant (attached as Exhibit 3) reflect the following violations:

- In 2018, the defendant lost a period of good time and other privileges due to interfering with a staff member's performance of duties by running away and refusing to stop as ordered. Exhibit 3 at 1.
- In 2013, the defendant incurred a violation for "possessing a hazardous tool." *Id.*
- In 2013, the defendant incurred a violation for sending a letter and asking that it be forwarded to a third person. *Id.*
- In 2013, the defendant admitted to refusing to obey an order. *Id.* at 2.

---

[4] The defense motion calls the defendant's record unusually light for a federal defendant. Def. Memo. at 2. The government does not disagree that this is a comparatively modest criminal record. On the other hand, the record is not free of prior criminal activity, and does reflect that the defendant had multiple experiences with the criminal justice system prior to the crime in this case.

- In 2013, the defendant was found to have participated in a plan to introduce drugs into FCI Cumberland. *Id.*

- In 2012, the defendant engaged in "disruptive conduct," and according to BOP notes denied having allowed another inmate to use his email account. *Id.*

- In 2012, the defendant incurred a violation for possessing an unauthorized item. *Id.* at 3.

- In 2011, the defendant admitted to sending emails to another inmate through a third party, and incurred a violation for disruptive conduct. *Id.*

- In 2010, the defendant incurred a violation for possession of an unauthorized item, apparently unauthorized stamps. *Id.*

- In 2010, the defendant incurred a violation for possession of an unauthorized item. *Id.* at 4.

- In 2009, the defendant incurred a violation for being absent from a work assignment. *Id.*

The defendant's disciplinary history involves a wide spectrum of violations, ranging from minor infractions to engaging in drug conduct. The government acknowledges that many of the violations are dated (there is only one violation later than 2013). However, the combination of the disciplinary history, with the prior criminal history, and the facts of the instant offense, raise some concerns about the need to protect the community from further crimes of the defendant.

C. Guidelines and Applicable Minimum Sentence

The defense points out that the defendant, if sentenced today, would be facing a lower guidelines level and would not be subject to an enhanced sentence under 21 U.S.C. § 851. Def. Memo at 4, 13-14. The defense analysis appears to be correct. The defendant's guidelines range

9

and mandatory minimum sentence appear to be lower, and that is a factor that favors his motion under 18 U.S.C. § 3553(a).

Fundamentally, however, the government believes that the proper resolution in this case should depend not on the intricacies or changes in the guidelines, but on a substantive evaluation of what the proper remaining sentence should be based on the totality of the § 3553(a) factors. To be sure, the application of the guidelines is itself a § 3553(a) consideration. However, the predominating § 3553(a) factors, here, should be the nature of the underlying offense and the specific circumstances of this defendant, including his past history and (the government agrees) his health issues. On the facts of this case, the government respectfully submits that the proper course is for the defendant to serve his sentence.

D. <u>The Defendant's Health Issues Balanced With the § 3553(a) Factors.</u>

The government's position in this case is based on its assessment of the proper balance of the various § 3553(a) factors (which support the current sentence) with the defendant's identified health issues, in the context of the COVID-19 pandemic. In conducting that assessment, the government believes that this is a relatively close case, and the government does not disagree with the factual statements made in the defense memorandum.

First, of particular note for the government is the current situation at the Federal Correctional Institution at Florence, Colorado (FCI Florence), where the defendant is currently incarcerated. As the defense points out, the COVID-19 numbers at FCI Florence are very substantial, according to BOP's COVID-19 resource website:

| Facility | Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered | City | State |
|---|---|---|---|---|---|---|---|---|
| Florence FCI | 98 | 41 | 1 | 0 | 492 | 5 | Florence | CO |

*See* https://www.bop.gov/coronavirus/ (visited December 31, 2020). This is surely a serious situation, and the government does not discount that fact. But, it appears to be the case (as of this writing) that the situation is improving at Florence. At the time of the defendant's filing on December 24, the facility had 145 positive COVID cases, one of the most severe in the BOP. Def. Memo. at 1. Currently, the number is 98 positive inmates, with 492 recovered inmates. There is, importantly, one inmate death. The government would not dispute that the situation bears watching, but the reduction from 145 to 98 current cases does suggest a hope that the facility's situation is getting better.

Secondly, also supportive of the defendant's motion is the fact that he has served the majority of his prison sentence, and is relatively close to his scheduled BOP release date, February 7, 2023 (with a home detention eligibility date of August 7, 2022). *See* BOP Sentencing Computation Documents at 1-2, attached as Exhibit 4. Likewise, at age 42, the defendant is much older than he was when the instant crime was committed, or when his prior crimes were committed. The government, again, disputes none of this, but still has concerns about simply cutting the defendant's prison sentence off at this stage.

[redacted]

In the event that the Court decides that a modification to the defendant's sentence is

appropriate, the government would ask that the Court impose some specific measures in order to address the aforementioned 18 U.S.C. § 3553(a) factors. Specifically:

First, the government would ask that the Court postpone any release to home confinement by 14 days in order to allow for an orderly out-processing of the defendant, and any appropriate medical clearance prior to the defendant's release from BOP.

Second, the government requests that the defendant be placed on home confinement through February 7, 2023, his currently designated BOP release date. Home confinement would provide a measure of community protection and would also provide a just completion of the defendant's sentence, consistent with the interests set forth in 18 U.S.C. § 3553(a).

## CONCLUSION

The government respectfully requests that the Court deny the defendant's motion for a sentence reduction.

Respectfully submitted,

Robert K. Hur
United States Attorney


By:_____/s/_____
Michael C. Hanlon
Assistant United States Attorney

36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
410-209-4895
Michael.hanlon@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be sent by email to:

Richard Bardos, Esquire

                         _____/s/_____
                         Michael C. Hanlon
                         Assistant United States Attorney